EX PARTE, COFFELT

5-3449                                                    389 S. W. 2d 234

Opinion Delivered April 19, 1965.

[Rehearing denied June 7, 1965.]

*Kenneth Coffelt,* for appellant.

*Gordon & Gordon, Felver A. Rowell, Jr.,* for appellee.

JIM JOHNSON, Associate Justice. This is an original petition for writ of certiorari in the Supreme Court for review of a contempt of court judgment.

The history of this litigation is briefly as follows: early in 1962 Sam Bell gave the bulk of his property to his favorite niece, Leila Dereuisseaux. Bell died, and after paying funeral and other expenses, Leila in turn gave the rest of the property (real property, a mortgage and cash) to her daughter, Billie Jean. Billie Jean delivered $12,000 in cash to their attorney, Kenneth Coffelt ($2,000 of which was for attorney's fees), and entered into a contract in which they agreed to build and operate a motel. On suit by the administrator of Bell's estate and a creditor, the Faulkner Chancery Court on September 4, 1963, set aside the conveyances from Sam to Leila to Billie Jean as being fraudulent, which was affirmed by this court in *Dereuisseaux* v. *Bell,* 238 Ark. 60, 378 S.W. 2d 208. In the chancery court order Coffelt, a party defendant, was ordered to turn over to the clerk of the court as receiver the money he received from Billie Jean. Coffelt failed to comply. On December 17, 1963, the court issued an execution which was returned unsatisfied by the sheriff. In May, 1964, this court affirmed the chancery court judgment *(Dereuisseaux* v. *Bell, supra),* and on June 2, 1964, the administrator and the then judgment creditor (the creditor having in the interim reduced his claim to a judgment) petitioned the court to require Coffelt to appear and show cause why he should not be cited for contempt of court for failure to comply with the court order. A show cause order was issued June 16, 1964. At the conclusion of the evidence and

argument the cause was taken under consideration. On August 4, 1964, the court entered an order finding Coffelt in contempt of court for willful failure to comply with the September 4, 1963 *(Dereuisseaux* v. *Bell)* order to turn over to the clerk the money he received from Billie Jean. His punishment was fixed at six months in the county jail commencing September 1, 1964, provided, however, if Coffelt delivered $10,000 to the clerk of court the jail sentence would be abated.

There being no appeal from a contempt judgment, Coffelt on August 20, 1964, filed a petition in this court for writ of certiorari, (1) to have the record brought up, (2) for review of the record by this court, and (3) to quash the contempt judgment.

Petitioner contends that (1) there is enough property in the estate to pay the judgment creditor without using the $10,000; (2) that petitioners below (respondents here) are in error in contending that after the judgment is satisfied the remaining assets, if any, would not go back to Leila; and (3) that the real property and mortgage should have been sold and converted into cash before requiring him to deliver the $10,000 into the registry of the court. These contentions of course go to the merits of the Dereuisseaux versus Bell litigation and are not within the purview of the order petitioner seeks to have quashed. [See *Dereuisseaux* v. *Bell, supra,* last paragraph, leaving t h e s e matters open. See also Ark. Stat. Ann. § 62-2402 (Supp. 1963)]. Petitioner cannot refuse to obey an order and then question the correctness of the order by certiorari in lieu of appeal. Two contempt cases are in point: (1) *Carnes* v. *Butt,* 215 Ark. 549, 221 S.W. 2d 416, in which was said:

"But during the interim allowed for the benefit of each side, the defendants arbitrarily concluded that the court was wrong in issuing the injunction, hence it could be disobeyed without penalty. The law is otherwise. The proper procedure would have been to obey the order until a higher court passed upon its validity."

and (2) *Stewart* v. *State,* 221 Ark. 496, 254 S.W. 2d 55:

"That the petitioners thought the order too comprehensive is of course immaterial, since it was their duty to obey even an erroneous decree as long as it continued in force. *Carnes* v. *Butt*," [*supra*].

Petitioner's primary contention is that the contempt judgment was issued in error because petitioner is unable to comply with the order because (1) he is insolvent, (2) the $10,000 never belonged to him, but to his wife, (3) he gave the $10,000 to his wife on August 1, 1963, one month before the decree of September 4, 1963, and (4) to put petitioner in jail would in effect imprison him for a debt.

The facts are undisputed that (1) during trial on July 30 and 31, 1963, petitioner had testified that he had $10,000 (of the $12,000) received from Billie Jean in his lockbox, (2) on August 1, 1963, petitioner gave the $10,000 to his wife (who thereafter gave it to petitioner's brother in Missouri), and (3) that the court order against petitioner was issued September 4, 1963.

Under questioning by the court during the contempt hearing on July 27, 1964, the petitioner, after testifying that his land had been conveyed to his wife but that the deeds had not been recorded, testified as follows (as abstracted by petitioner):

"The Court: What did you do with the $10,000.00 that you stated that you had in the lock box?

Mr. Coffelt: I gave it to my wife, just like I set out in the Response.

The Court: When did you give it to her?

Mr. Coffelt: I gave it to her the day after we finished taking the testimony here in this trial [*Derevisseaux* v. *Bell*].

The Court: You knew at that time that the ownership of the $10,000.00 was in issue in this proceeding.

Mr. Coffelt: Well, yes, the ownership of the property was involved, but the ownership of all of Sam Bell's property was involved.

328

The Court: Knowing that to be true, why did you dispose of that property after telling the Court there that you had it in a lock box?

Mr. Coffelt: I did have it.

The Court: And that you were going to keep it there.

Mr. Coffelt: I did have it in the lock box. There's two reasons for it, Judge. I'm going to be absolutely truthful to you about it, there's two reasons. In the first place, the property belonged to my wife. There's no question about that. There's three reasons. The second is that I think she's liable under this contract with Billie Dereuisseaux on the grounds of specific performance. If the Court had — she wasn't made a party to this lawsuit and if — I told her, I said, "I don't know what the Court is going to do, but you're not made a party to this lawsuit. I want you to take the money. It belongs to you anyway and I want you to have it where, if and when there is ever any Order directed against me, I don't want them to be able to enforce it."

And further:

"The Court: What has happened to the money since you turned it over to your wife?

Mr. Coffelt: Judge, she has not got that money and I think possibly that as of this moment, I'd have to find out.

The Court: She still has it?

Mr. Coffelt: I don't think so, as of this moment.

The Court: It's available to her?

Mr. Coffelt: I don't know of this moment.

The Court: Well, of course, you're splitting hairs, aren't you, Mr. Coffelt? You're up here and you're in effect saying that — "Well, something could have happened to the money since I left Little Rock." When you left home you knew where the money was, didn't you?

Mr. Coffelt: No, sir.

The Court: When did you last know where the money was?

Mr. Coffelt: For sure—. I tell you what I think about it. In fact, I think I know. I think that that money is in the possession of my brother in St. Louis as security for a loan.''

And further:

''The Court: You owe him some money and you put this money with him as security for that?

Mr. Coffelt: No, I didn't do that.

The Court: Who owes him the money?

Mr. Coffelt: Both of us.

The Court: You and your wife?

Mr. Coffelt: That's right.

The Court: Who made arrangements with him to borrow the money?

Mr. Coffelt: Both of us.

The Court: Who did the negotiating?

Mr. Coffelt: Both of us.

The Court: And when did you borrow the money from him?

Mr. Coffelt: It's been something like three years ago.

The Court: How much did you borrow?

Mr. Coffelt: $15,000.00.

The Court: What other security did you give?

Mr. Coffelt: Didn't give him any. He's got a blanket note.

The Court: Well, has this $10,000.00 been paid to him on it, that note?

Mr. Coffelt: I don't know whether he considers it as being paid to him or not.''

Having elicited the above and other testimony, the judge on exchange in his meticulous opinion examined the

proceedings and testimony with great care and reached the conclusion, first, that petitioner is in effective control of the $10,000, even though it is not in his immediate possession, and has the ability to see that the funds are paid to the clerk as originally decreed, if he so desired, and second, that by delivering the money to his wife, petitioner was evading compliance with the forthcoming decree, and that such action "was so contumacious in nature and unbecoming to an attorney and officer of the court that his present plea of inability to comply cannot be accepted as a bona fide defense to the contempt of court charge."

The rule is well settled that:

"[W]here an alleged contemnor . . . . has voluntarily and contumaciously brought on himself disability to obey an order or decree, he cannot avail himself of a plea of inability to obey as a defense to a charge of contempt." 120 A.L.R. 704, 12 Am. Jur. 2d, Contempt, § 51, p. 53.

Petition denied.

ROBINSON, J., not participating.